(93 Misc. Rep. 600)

In re CARNEY.

In re PRATT.

(Supreme Court, Special Term, Rensselaer County. February, 1916.)

1. JUDGES ⟨key⟩56—DISQUALIFICATION—EFFECT.
    That a justice of the Supreme Court at Special Term, after hearing the report of a referee on an application to compel an accounting by an attorney, and after writing an opinion thereon, was assigned to the Appellate Division, and so disqualified to further act in the matter, before signing any decision or order, does not prevent the presentation of the report to another Special Term; the matter being within the power of the court, not merely of the judge presiding at the hearing.
    [Ed. Note.—For other cases, see Judges, Cent. Dig. §§ 235-245; Dec. Dig. ⟨key⟩56.]

2. ATTORNEY AND CLIENT ⟨key⟩147—COMPENSATION OF ATTORNEY—CONTINGENT FEES—ADVANCEMENT OF DISBURSEMENTS.
    An agreement in writing by an attorney with the children of a deceased woman, who it was claimed was the descendant of one who died intestate in Illinois, to institute all requisite proceedings to establish the right of the children in the estate, and to loan any money needed for disbursements incident to the proceedings, which the clients agreed to return, together

with 50 per cent. of any recovery as compensation to the attorney, was, in the absence of fraud, valid and binding.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 351; Dec. Dig. ⬳147.]

3. ATTORNEY AND CLIENT ⬳148(3)—COMPENSATION OF ATTORNEY—EXPENSES.

Where an attorney agreed to institute requisite proceedings to establish the right of his clients in a decedent's estate and to loan them any money required for disbursements, which they agreed to repay, with 50 per cent. of any recovery, any sum paid to another attorney for legal services should come out of the share of the attorney originally employed, not from the share of the clients.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 352; Dec. Dig. ⬳148(3).]

4. ATTORNEY AND CLIENT ⬳134(1)—COMPENSATION OF ATTORNEY—SETTLEMENT BY CLIENTS.

Where a referee found on sufficient evidence that parties who employed an attorney to establish their interest in a decedent's estate had voluntarily entered into an agreement with other parties to settle litigation, though the attorney refused to become a party to the settlement, they are not released from their agreement for compensation of the attorney.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 301; Dec. Dig. ⬳134(1).]

5. ATTORNEY AND CLIENT ⬳144—COMPENSATION OF ATTORNEY—EFFECT OF CONTRACT.

A valid contract for compensation of an attorney alone fixes the rights of the parties, regardless of the value of his services.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 332, 333; Dec. Dig. ⬳144.]

6. ATTORNEY AND CLIENT ⬳152—COMPENSATION OF ATTORNEY—EXPENSES.

Under a contract of employment by an attorney to establish the rights of the clients in a decedent's estate, by which he agreed to loan sums required for disbursements, to be repaid, together with 50 per cent. of any recovery as compensation, the attorney is entitled, in a proceeding by some of the clients for an accounting, to be reimbursed for their proportionate part of the money disbursed by him for expenses.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 314; Dec. Dig. ⬳152.]

7. ATTORNEY AND CLIENT ⬳176—COMPENSATION OF ATTORNEY—LIEN.

In a proceeding by clients for an accounting by an attorney whom they have employed to institute proceedings to establish their rights in a decedent's estate, for which it was agreed to pay him 50 per cent. of any recovery, where there is likely to be a further distribution of money and property to the clients as the result of the attorney's services, the attorney is entitled to a lien on all moneys and property distributed from the estate.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 381; Dec. Dig. ⬳176.]

Applications by James Carney and by Elizabeth T. Pratt to compel an accounting by Thomas F. Powers, an attorney. On motions by petitioners for new trial, and motions by respondent to reject in part and confirm in part the report of the referee. Final orders entered.

See, also, 159 App. Div. 931, 144 N. Y. Supp. 1108; 161 App. Div. 906, 145 N. Y. Supp. 1116.

The opinion of Referee Herrick, referred to in the opinion of Mr. Justice Chester, is as follows:

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

I have held the agreement in these proceedings invalid largely because it is an agreement on the part of the defendant to advance the necessary expenses of conducting the litigation or proceeding necessary to be taken to establish the rights of the other parties to the agreement. That that was the intention and design is apparent from the fact that the defendant did pay such expenses and did not deduct the amount thereof, excepting in one instance, from the distributive shares of the petitioners before taking his 50 per cent. The agreement I think is void upon its face, and it is not necessary for me to cite authorities.

In establishing the reasonable value of defendant's services in these proceedings, three lawyers of established reputation were called by the defendant, all of whom testified that the reasonable worth and value of the defendant's services in these proceedings was 50 per cent. of the recovery after deducting the necessary expenses of the litigation or proceeding. No one was called in behalf of the plaintiff to give testimony as to the value of the defendant's services. While, perhaps, as a matter of law, I have the right to disregard the testimony of these witnesses, I do not feel that, in the absence of any testimony to the contrary, I am at liberty to assert any private views of my own that may be in conflict with the uncontradicted testimony of three gentlemen of very high standing at the bar upon a mooted question like that of the value of a lawyer's services.

I am perfectly aware of the very anomalous condition in which the conclusions which I have arrived at place this case, and that it results apparently in a decision which causes an illegal contract under which the attorney is to pay the expenses of the proceedings being more advantageous to the plaintiff than to pay what has been found to be the reasonable value of his services after deducting the amount of the expenses. But with my view of the law in relation to such agreements, and what I feel to be the almost absolute necessity of abiding by the testimony of the witnesses produced as to the value of the legal services rendered in these proceedings, I cannot see my way clear to coming to any other conclusion.

I have been asked by the plaintiff's counsel to hold that where any attorney has entered into an illegal agreement, and it has been so held, that then he is not entitled to recover anything for his services. I do not think the order of reference permits me to determine that question. The order is a limited one, confining the referee to certain specific things, and to report to the court upon these things, where a final action is to be taken.

In passing upon the account of expenses rendered by the defendant, I have taken into consideration the fact that, relying upon his contract and not expecting to charge his expenses to his clients, the defendant has not been careful in keeping a record of all his expenses. But, bearing in mind the defendant's reputation as a lawyer, I do not believe that he has made an overestimate of those things of which he did not have an exact account.

The item for Mr. Clinton and for office help I do not think should be allowed. They are the kind of services that are presumably paid for and taken into consideration in determining the value of the services and the work to be performed by any lawyer when he engages himself to perform services for a client, and when the estimate is given that the reasonable worth and value of a lawyer's services in a proceeding such as this is a given amount, exclusive of expenses, I do not understand that that means his office expenses, or the amount that he chooses to pay either employés in his office, or an associate in his office that he employs to assist him from time to time.

The following opinion of Cochrane, J., is referred to in the opinion of the court:

I cannot agree with the learned referee that the contract of February 9, 1909, was void for champerty. At the time it was made a proceeding was, and had for some time been, pending in the probate court of Chicago, which was the only proceeding contemplated or to which resort could be had for the establishment of the rights of the petitioners. No question ever existed as to the right of these petitioners to participate in the Baker estate, provided their identity and legitimacy as descendants of William D. Remey was estab-

lished. Distribution of a portion of the estate had already been made before the contract in question and the rights of these petitioners were recognized in such distribution to the extent that their distributive shares had been set apart and were being held subject only to satisfactory proof as to such identity and legitimacy. There was no proceeding, actual or contemplated, hostile to the Remey descendants as such. All that was required was to ascertain who such descendants were. The representatives of the Baker estate were pursuing this problem and endeavoring to solve it. Their efforts and those of Mr. Powers were being directed to the same end. He was seeking to convince the representatives of the Baker estate of the identity of his clients as descendants of Remey, and such representatives were willing to be convinced on satisfactory evidence. The representatives of the state were actually making an investigation in this state to determine the identity of these Remey descendants.

The referee has found in response to one of the requests of the petitioners and in accordance with the undisputed evidence that "prior to the time of the execution of said contract of retainer between said Powers and said Elizabeth Pratt, James Carney, and John Carney, a portion of the said Baker estate had been distributed, and that portion of the said estate representing the share of Elizabeth Pratt, James Carney, John Carney, and Cornelius M. Carney had been set apart to await proof of the identity and relationship of the said Elizabeth Pratt, James Carney, John Carney, and Cornelius M. Carney; and the representatives of said Baker estate were trying to locate and identify the said Elizabeth Pratt, James Carney, John Carney, and Cornelius M. Carney, through David A. Thompson, an attorney of Albany, N. Y., for the purpose of paying to the said Elizabeth Pratt, James Carney, John Carney, and Cornelius M. Carney their respective shares of said Baker estate when their identity and relationship should be established." Under these circumstances I think this case is similar to Fowler v. Callan, 102 N. Y. 395, 7 N. E. 169, and Ransom v. Cutting, 188 N. Y. 447, 81 N. E. 324, and is controlled thereby. Subsequent to those cases section 74 of the Code of Civil Procedure was amended by adding the words "or of representing the claimant in the pursuit of any civil remedy for the recovery thereof," and as so amended it applies to the present case. But I do not think that such amendment removes the case from the effect of the authorities above cited. The opinions in those cases were not at all based on the fact that the remedy invoked was a "special proceeding" rather than an "action," for, if that were so, the cases could very readily have been disposed of by merely making such statement. The opinions, however, contain nothing of the kind. Furthermore, Fowler v. Callan, supra, was disposed of with reference to the provisions of the Revised Statutes (3 R. S. [6th Ed.] pt. 3, c. 3, tit. 2, p. 449, § 59) subsequently revised into section 74 of the Code of Civil Procedure, and such provisions of the Revised Statutes were fully as broad and comprehensive as section 74 of the Code of Civil Procedure became by the amendment above referred to which was made in the year 1907 (Laws 1907, c. 700).

In Fowler v. Callan, supra, it was stated in the opinion that: "The contract in no respect induced the litigation. That was already begun and existed independently of the agreement, and originated in other causes. It did not tend to prolong the litigation. It made it to the interest of the attorney to close it as briefly and promptly as possible, and at as little cost and expense as prudence would permit. The plaintiff, therefore, stirred up no strife, induced no litigation"—and again as if seeking at the end of the opinion to state definitely the ground of the decision: "Our conclusion rests more strongly upon the conviction that the agreement made was one for compensation merely and had in it no vicious element of inducing litigation or holding out bribes for a retainer." In Ransom v. Cutting, supra, it was said at page 452 of 188 N. Y., at page 325 of 81 N. E.: "The purpose of section 74 of the Code of Civil Procedure is to prevent an attorney from encouraging, instigating or promoting ill feeling or strife, and thereby securing the ownership or control of a demand of any kind for the purpose of bringing an action thereon" or (it should now be added in view of the amendment of 1907), of representing the claimant in the pursuit of any civil remedy in the

recovery thereof. The contract of Mr. Powers neither in fact nor in contemplation had the effect of "encouraging, instigating or promoting ill feeling or strife" which it was the purpose of said section 74 to prevent, nor could it by any reasonable probability in the ordinary course of events produce or tend to produce such a result, and hence I conclude that such contract was not champertous.

The referee has found that no fraud has been proved to have been practiced by Mr. Powers in making the contract. The ordinary rules affecting the relationship of attorney and client should not be applied in considering this contract of employment. Clifford v. Braun, 71 App. Div. 432, 75 N. Y. Supp. 856; Boyd v. Daily, 85 App. Div. 581, 83 N. Y. Supp. 539, affirmed 176 N. Y. 613, 68 N. E. 1114; Matter of Howell, 215 N. Y. 466, 472, 109 N. E. 572. For the purposes of this case, however, I may assume that it was the duty of Mr. Powers before he made the contract to see that his prospective clients were acquainted with every fact within his possession which might aid their judgment in determining whether or not they should make such contract. I shall assume that the petitioners had a right to know all that Mr. Powers knew about the size of the estate and to have from him a fair statement, without suppression or exaggeration, of the actual difficulties in the way of their success and of any fact or evidence known to him at that time which would materially diminish such difficulties. Certainly knowledge of the amount of the Baker estate was an important factor to be known by the petitioners in making this contract. Mr. Powers had been told by Mr. Thompson that it was a large estate. The expression "large estate" is very elastic, but there is no evidence that either Mr. Thompson or Mr. Powers had at that time any more definite knowledge as to the amount of the estate. No figures seem to have been mentioned. More than two years before this contract in question James F. Upham had taken Mrs. Pratt to Mr. Fagan, an attorney of Troy, with whom she had made a contract concerning the same subject-matter as her contract with Mr. Powers. Upham says that he told Mrs. Pratt that "if she could prove her relationship she had a large sum of money coming to her, the amount I don't know," and that "there was a large sum of money out there, and she might get a share of it if she could prove who she was." This is uncontradicted. Mrs. Pratt admits that Mr. Thompson told her when he called on her just prior to her contract with Mr. Powers that "there was quite a bit of money there." She therefore had all the information on this subject which Mr. Powers possessed. She does not claim that Mr. Powers made any statement to her as to the amount of the estate. Evidently she did not exact any such statement from him because she knew as much about it as he did.

It is said, however, that Mr. Powers had important information from Mr. Thompson and Daniel Carney as to obtainable evidence which he did not disclose. From the record I think that neither Mr. Thompson nor Daniel Carney had at that time any very valuable information. The real question was to prove a marriage many years ago between William Remey and the grandmother of these petitioners. There was no question about their having had children, but there was a question as to the legitimacy of those children. Daniel Carney had no personal knowledge on that subject. At page 143 of the stenographer's minutes he was asked to give the names of any witnesses by whom he proposed to prove the relationship of the Carney children, and in response thereto he gave the names of various persons who had more or less acquaintance with the Remey family; but the importance of these persons as witnesses and the value of any testimony which they might be able to give were unknown and could not be determined until tested by search, investigation, interviews and analysis. One of these persons subsequently testified that he was present at a marriage ceremony between Remey and the grandmother of the petitioners performed by a justice of the peace now dead; but there is no evidence that Mr. Powers knew when the contract in question was made that he would so testify, and his credibility as a witness seems to have been subsequently the subject of some concern. Daniel Carney had no definite information of controlling importance or of such a nature as that if it had been explained to these petitioners it would have influenced them

in making this contract in question. No attorney could tell, even with the assistance of Mr. Thompson and Daniel Carney, just how much litigation he had to encounter or the outcome thereof. Daniel Carney was an uncle of Mrs. Pratt. According to his testimony they frequently visited each other. She it was who referred Mr. Thompson to him when Mr. Thompson approached her for information, and she says she had previously referred Mr. Fagan to him. Whatever information Carney possessed it is quite probable had been communicated by him to Mrs. Pratt, but whether it had been or not is not of much importance so far as this particular question is concerned, because, as stated, it was not of such a nature that it could affect her judgment in making the contract in question.

It is possible that when James Carney signed the contract he did not know that the Baker estate was a large one. But about a month thereafter we find him visiting his sister, and it is too much of a tax on human credulity to infer that after that visit he did not know as much about the situation as did she. And he did not then nor for a long time thereafter make any protest or objection to the contract he had made. The fact is that when this contract was made all parties to it were very much in the dark. But it is further urged that Daniel Carney colluded with Mr. Powers to give him information and assistance which he withheld from his nephews and niece, and that the price of his collusion was a division of the profits which Mr. Powers was to obtain for his services. The only evidence of this is that given by Daniel Carney himself, which is denied by Mr. Powers, and the referee has expressly found against that proposition. I conclude, therefore, that the contract was obtained without fraudulent suppression or concealment or representation.

The conclusions I have reached make it unnecessary to consider that part of the referee's report as to the reasonable value of the services and I express no opinion in reference thereto. I think that what was paid on the $7,700 Martin contract should be regarded as a settlement of litigation and deducted from the amount received before a division of the proceeds. It is true that Mr. Powers says he did not advise that contract and that he told his clients he would not consent to have any payment thereunder deducted from his compensation. But he did not advise against it. He says he was not certain of his position. It was probably good judgment to make the contract. It disposed of the opposition, removed the possibility of failure, and, inasmuch as Mr. Powers was not sufficiently sure of his position to feel justified in advising against the contract and has had the benefit of the same, I think that under the circumstances payments thereunder should be deducted from the amount received before the division. The payment of $500 to Mr. Welch being for legal services, it seems to me should be paid from the share of Mr. Powers. Other disbursements of Mr. Powers are adopted as fixed by the referee.

Neither party having been entirely successful in these proceedings, each should pay his own costs, but the referee's fees and disbursement, including the stenographer's fees, may be charged as a disbursement against the fund in controversy. An order may be entered to effectuate the views herein contained, which order should be settled on notice. If there is any matter involved herein not covered by this memorandum, it may be disposed of on the settlement of the order.

Ordered accordingly.

James Farrell, of Troy, for petitioners.
Shaw, Bailey & Murphy, of Troy (John T. Norton, of Troy, of counsel), for respondent.

CHESTER, J. [1] These proceedings came before the court in the first instance upon petitions and orders to show cause why the respondent should not account to the respective petitioners for certain moneys and securities claimed to have been received by him in his capacity as an attorney and counselor at law. The orders to show cause were returnable at a Special Term of the court, and resulted in orders of

reference made by such court, with power to the referee to take the evidence of the parties with respect to the matters referred, and with directions to him to return to the court for its further action in the premises his findings of fact and conclusions of law thereon, and his opinion and recommendations upon the matters submitted to him. An appeal was taken in each proceeding from such order to the Appellate Division by the respondent where the order was modified in important respects. The referee was directed with respect to the matters referred to him in such modified order to "report the same to the court with his conclusions." The referee took a large amount of testimony submitted by the respective parties and made his report to the court, stating his findings of fact and conclusions of law in each case and also writing a brief opinion. Thereupon the petitioners served a notice in each case upon the respondent that the report and opinion of the referee, together with the testimony, exhibits, and papers produced before him would be presented to the court at a Special Term thereof appointed to be held at Hudson on the 16th day of January, 1915, and that an application would then be made on behalf of the petitioner for an order confirming a portion of the referee's report and rejecting a portion of it. Mr. Justice Cochrane presided at said last-named Special Term, and the matter was argued and submitted by the counsel for the respective parties. Justice Cochrane, after considering the case, wrote an opinion in which he discussed the matters involved at considerable length. Before signing any decision or order in the two cases, but after handing down his opinion, he was assigned to the Appellate Division.

The petitioners insist that because of his disqualification from performing any duty at the Trial and Special Terms arising from that designation there has been a mistrial and that the whole matter must be taken up de novo. I am unable to agree with this position. The referee was not appointed to hear and determine, nor was he appointed to report to Justice Cochrane, but to the Supreme Court. The report of the referee was submitted to such court, and not to Justice Cochrane, but it happened to be submitted to a Special Term held by him. The duty devolved upon the court to act upon the matter, and, while Justice Cochrane presided at the Special Term, the matter was none the less at all times before the court, and not before him as a justice thereof. When he became disqualified to act at Special Term, it was open to any of the parties in interest to bring the matters on at any other Special Term of the court. There is no question here of one Special Term reviewing the decision of another Special Term, for the reason that the first Special Term rendered no decision. There is here, therefore, no decision of that kind to review. An opinion merely is not a decision.

The case of Williamson v. Randolph, 111 App. Div. 539, 97 N. Y. Supp. 949, affirmed 185 N. Y. 603, 78 N. E. 545, cited by the petitioners, is not in point, for the reason that that involved the trial of an equity action before a court, where the court was not only to hear, but also to determine, the action, and where the justice presiding was assigned to the Appellate Division, after he had written an opinion

announcing a determination in favor of the defendant, but before he had in fact signed a decision to that effect, and it was held that there must be a new trial. The distinction between that case and these proceedings is readily apparent, from the facts already stated. These proceedings came before the Special Term held by Justice Cochrane upon the report of the referee. The fact that the justice became disqualified from holding a Special Term before a decision had been rendered cannot stand in the way of the report of the referee being presented to any other Special Term. The trial or hearing in these proceedings was not before the referee, but it is before the court, to whom the referee was directed to report, and to which he in fact did report. Matter of Cartier v. Spooner, 118 App. Div. 342, 103 N. Y. Supp. 505; Matter of Jones & Co., 117 App. Div. 775, 777, 102 N. Y. Supp. 983; Matter of Ney Co., 114 App. Div. 467, 470, 99 N. Y. Supp. 982; Marshall v. Meech, 51 N. Y. 140, 143, 10 Am. Rep. 572; Fenlon v. Dempsey, 21 Abb. N. C. 291; Muhlenbrinck v. Pooler, 40 Hun, 526, 527; Dean v. Driggs, 82 Hun, 561, 564,. 31 N. Y. Supp. 548; Doremus v. Doremus, 76 Hun, 337, 27 N. Y. Supp. 1039.

In Matter of Cartier v. Spooner, supra, the court said:

"In a proceeding of this character the court must determine the controversy, and it may order a reference only for the purpose of assistance to itself in that regard. It cannot shift the whole matter to a referee. If a reference be ordered, the matter must come back to the court on the report of the referee for final determination, and the report may be adopted or disregarded and a different decision made on the facts."

For these reasons, the motions of the respective petitioners for a new trial should be denied.

Concurrent with said motions made by the petitioners for a new trial, the respondent has now made a motion in each case to disapprove and overrule the report of the referee and to dismiss the petition, with costs. The proceedings are now, therefore, before the Special Term for determination, the same as they were before the Special Term held by Justice Cochrane at a time when he became disqualified to act,. before signing decisions or final orders. It appears from the evidence taken before the referee that on February 9, 1909, John Carney, James Carney, and Elizabeth T. Pratt, brothers and sister, believing that they had an interest in the estate of their deceased mother, Eliza R. Carney, who it was claimed was a descendant, through William D. Remey, of one Anna F. Baker, who died intestate in Illinois leaving a considerable estate, employed Mr. Powers, this respondent, to assist in establishing such claim for them. The agreement was in writing. Under it Powers agreed to institute all requisite proceedings to establish their rights in such estate, and they agreed that Powers' compensation for all services should be 50 per cent. of the recovered interest in the estate. Powers further agreed that, if these parties should need any money for disbursements incident to any proceedings or for any other purpose in connection therewith, he would loan them the same, and they agreed to repay all such moneys so loaned them, and also to pay for his services as above specified. Afterwards another brother, C. M. Carney, bound himself to the same agreement. The account-

ing asked for in these proceedings is for moneys and property received by the respondent while acting as attorney under such agreement.

Under the order of reference, as modified by the Appellate Division, it was referred to the referee to make inquiry as to the circumstances under which the above-mentioned agreement was made and as to its legality and fairness, and report the same to the court, with his conclusions, and in the event, in the opinion of the referee, such agreement should be vacated, that then the respondent account to the petitioner for the moneys, securities, and property, in his possession, received by him as attorney for the petitioners, and with power to the referee to inquire as to the conditions and value of the estate, the amounts received and to be received by such attorney on account of his clients' interest therein, so far as the referee deems it necessary in order to determine the fairness and the legality of the agreement.

The learned referee failed to find any fraud on the part of Mr. Powers in inducing the making of the agreement. He reported, however, that in his opinion it was void on its face. Notwithstanding that conclusion he held that Powers should be paid for his services to the petitioners, and that the reasonable value of such services was 50 per cent. of the distributive share of the petitioners, after deducting therefrom the necessary expenses of the litigation. In passing upon the account of expenses, the referee recommended the disallowance of moneys paid by Powers to an attorney or associate in his office who had assisted him and also moneys paid to employés therein. He also reported in favor of allowing all the other disbursements made by the respondent at the full amount stated in his account, and that he has a lien for the payment of his services upon all moneys and property distributed and to be distributed to the petitioners from the Baker estate.

The Special Term to which the reports of the referee were first presented, in the opinion written by Justice Cochrane, hereinbefore referred to, disagreed with the referee that the agreement was void and came to the conclusion that it was valid. He agreed with the referee that it was obtained without fraudulent suppression or concealment or representation.

[2] While the court now considering the matter is not bound by the reports and opinion of the referee, nor by the opinion of Justice Cochrane, it is strongly impressed by the reasoning of the latter and with the force of the authorities cited by him in respect to the validity of the agreement, and is also satisfied with his conclusion that it was obtained without any fraud on the part of Mr. Powers.

[3] I also agree with Justice Cochrane that the amount paid to Mr. Welch for legal services should come out of the share of Mr. Powers. In the agreement the latter was to institute all requisite proceeding to establish the rights of the parties in the estate, and this expense should not be added to the amount which the parties agreed to pay Powers for services, but deducted therefrom. Mr. Powers had employed Welch as an attorney in Chicago to look after the Baker estate in the probate court there, and he should pay him.

[4] I am compelled to disagree with the conclusion of Justice Cochrane stated in his opinion, with respect to the amount paid on what is known as the Martin contract. The referee has found on sufficient evidence that this contract was an agreement between Martin's clients and the Carneys and Mrs. Pratt in settlement of litigation or to purchase peace, "was not made upon the advice of Mr. Powers, but was made after Mr. Powers had told him (James Carney) that in his judgment it was unnecessary, and after Mr. Powers had, to James Carney's knowledge, refused to join in it, as to his (Powers') then contracted share." The referee also found:

"That when the time came for the presentation to the Illinois court of the evidence and depositions, Mr. Powers felt reasonably sure of his success, and so advised his client, James Carney."

The Martin contract was voluntarily entered into by the petitioners with full knowledge of the situation, after Powers had refused to become a party to it, or to advise them to make it, and after he had refused to permit his share to be diminished by reason of it. There is no reason, therefore, why the parties thereto should not be left to be bound by the agreements they have made.

[5, 6] If I am correct in the conclusion which I have reached that the agreement between the parties is a valid one, that alone must fix their rights, and the rate of compensation which the respondent is entitled to receive for the services rendered and to be rendered thereunder, regardless of the value of such services. The respondent is also entitled to be reimbursed from these petitioners for their proportionate part of the moneys disbursed by him for expenses as found by the referee, which amount all told to the sum of $1,975.

[7] It appears from the evidence that there is likely to be a further distribution of money and property to the petitioners as the result of the respondent's services in establishing their claim thereto. For that reason, and because the petitioners have tried to take the matter out of his hands, I approve the conclusion of the referee that Mr. Powers has a lien upon all the moneys and property distributed and to be distributed to the petitioners from the Baker estate for his services.

It also appears that the respondent has fully accounted for all the money and property of the petitioners which have come into his hands, and for that reason they are entitled to no relief in these proceedings.

Decisions or final orders in harmony with the conclusions above stated may be submitted for signature, with costs in each case against the respective petitioners. Copies of the opinions of the referee and of Mr. Justice Cochrane, which have been referred to, are published herewith.

Ordered accordingly.